**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: RICHARD G. SHERMAN; In re:
ANDREA PEARL SHERMAN,
                              *Debtors,*

_____

RICHARD G. SHERMAN; ANDREA
PEARL SHERMAN,
                              *Appellants,*

                v.

SECURITIES AND EXCHANGE
COMMISSION,
                              *Appellee.*

No. 03-56601

D.C. No.
CV-02-05571-CAS

AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
April 5, 2005—Pasadena, California

Filed March 23, 2006
Amended July 3, 2007

Before: Sidney R. Thomas and Marsha S. Berzon,
Circuit Judges, and James C. Mahan,* District Judge.

Opinion by Judge Berzon

_____

*The Honorable James C. Mahan, United States District Judge for the
District of Nevada, sitting by designation.

7891

**COUNSEL**

Arthur A. Greenberg, Harold Gutenberg, and Don Lanson, Greenberg & Bass, Encino, California, for the appellants.

Giovanni P. Prezioso, Jacob H. Stillman, Katharine B. Gresham, and Hope Hall Augustini, Securities and Exchange Commission, Washington, D.C., for the appellee.

**OPINION**

BERZON, Circuit Judge:

Richard Sherman (Sherman) was the attorney for several defendants in an enforcement action brought by the Securities and Exchange Commission (SEC) and in other actions in which those defendants were parties. Sherman and his wife, Andrea Sherman, filed a Chapter 7 bankruptcy petition. The SEC brought a motion to dismiss the Shermans' Chapter 7 bankruptcy petition pursuant to 11 U.S.C. § 707(a), maintaining that there was "cause" for dismissal. Although the bankruptcy court denied the SEC's motion, the district court reversed.

We are presented with three questions on appeal. First, we must consider whether the SEC has standing. The SEC has an

interest in the Shermans' bankruptcy petition because part of the debt that the Shermans sought to discharge resulted from orders against Sherman issued in the SEC enforcement action. Before the district court decided the appeal, however, Sherman and Thomas Lennon, the receiver appointed in the SEC action (Receiver), entered into a settlement agreement. We must initially decide whether the SEC had an interest in the Shermans' bankruptcy petition sufficient to confer standing. We must then decide whether the settlement agreement extinguished any interest the SEC initially had in the Shermans' bankruptcy petition, divesting the SEC of standing to proceed. Second, we address whether this appeal is moot because the bankruptcy court has already granted the Shermans a discharge. Finally, we are presented with a merits question: Did the bankruptcy court err in denying the SEC's motion to dismiss the petition for cause?

We hold that the SEC has standing because it retained a pecuniary interest as a creditor in some of the Shermans' debt, an interest not extinguished by the settlement agreement between Sherman and the Receiver. In addition, we conclude that this case is not moot, because the grant of the motion to dismiss could have had an impact on the parties despite the grant of a discharge order while the appeals were pending. Finally, we decide that the bankruptcy court did not err in denying the SEC's motion to dismiss the petition for cause. Other provisions of the Bankruptcy Code address the misconduct that the SEC argued constituted "cause" justifying dismissal. Thus, under *Neary v. Padilla* (*In re Padilla*), 222 F.3d 1184 (9th Cir. 2000), the petition could not be dismissed for "cause" under 11 U.S.C. § 707(a).

## I.  Factual and Procedural Background

The current appeal arises from a somewhat Byzantine set of events:

In 1997, the SEC commenced a securities fraud action against Whitworth Energy Resources, Ltd., Williston Basin Holding Corp., and Amerivest Financial Group, Inc., along with their principals (*Whitworth* action), in the United States District Court for the Central District of California. The complaint alleged, among other things, that the defendants operated a Ponzi-like scheme by representing that investors were receiving income from oil and gas production when, in fact, distributions were made from receipts obtained from new investors or assessments of existing investors. The district court entered an order freezing the corporate entities' assets and appointing Thomas Lennon as permanent receiver for the defendant entities and their subsidiaries and affiliates, including Oxford Oil and Gas, Inc. and the Oxford Group of Companies, Ltd.[1] The district court ordered that the Receiver was to have

> full powers of an equity receiver, including, but not limited to, full power over all funds, assets, property, securities, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, and other property belonging to or in the possession of or control of Whitworth, Williston, Amerivest, and any of their subsidiaries and affiliates.[2]

---

[1]We refer to Oxford Oil and Gas, Inc. and the Oxford Group of Companies, Ltd. collectively as the "Oxford companies."

[2]In relevant part, the order specified that the Receiver was "immediately authorized, empowered and directed" to do the following:

    A.   to have access to and to collect and take custody, control, possession, and charge of all funds, assets, property, securities, premises (whether owned, leased, occupied or otherwise controlled), choses in action, books, records, papers, and other property of Whitworth, Williston and Amerivest, and their subsidiaries and affiliates, with full power to control, manage, sue, foreclose, marshal, collect, receive, and take into possession all such property;

    . . . .

The district court granted the SEC's partial summary judgment motion, concluding that the principal defendants had violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[3] In 1999, the district court entered final judgment. The relief ordered included an injunction and provisions requiring the principal defendants to disgorge specified amounts of ill-gotten gains to the Receiver and pay civil penalties.

Appellant Richard Sherman, an attorney for several of the defendants in the *Whitworth* action, violated the *Whitworth* district court's freeze order by withdrawing a total of $54,980

---

    D.   to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, devaluation, concealment, or disposition of any funds, assets, property, securities and premises of Whitworth, Williston and Amerivest, and their subsidiaries and affiliates;

    E.   to make a further accounting, as soon as practicable to this Court and the Commission of the assets and financial condition of Whitworth, Williston, Amerivest, and their subsidiaries and affiliates, and to file the accounting with the Court and deliver copies thereof to all parties; [and]

    . . . .

    G.   to employ attorneys and others to investigate and, where appropriate, to defend, institute, pursue, and prosecute all claims and causes of action of whatever kind and nature which may now or hereafter exist as a result of the activities of present or past employees or agents of Whitworth, Williston, Amerivest and their subsidiaries and affiliates, including but not limited to *Insured Energy Drilling Program 1986-4, a limited partnership, et al. v. Trust Company of the West, a California trust company, et al.*, Case No. BC 108-297, pending in Los Angeles County Superior Court.

[3]We later affirmed this decision. *SEC v. Whitworth Energy Res. Ltd.*, 243 F.3d 549 (9th Cir. 2000) (unpublished table decision).

from the companies' litigation trust account and soliciting additional funds from investors. The SEC and the Receiver sought a judgment of civil contempt against Sherman from the *Whitworth* district court. In February 2000, that court found Sherman in contempt and ordered him to disgorge "to the Receiver" $54,980 plus prejudgment interest.[4] We affirmed. *SEC v. Whitworth Energy Res. Ltd.*, 243 F.3d 549 (9th Cir. 2000) (unpublished table decision).

In separate proceedings, commenced before the *Whitworth* action, the Oxford companies had filed, in state court, several suits concerning the ownership rights to various natural gas assets in Texas (contingency suits).[5] Sherman represented the Oxford companies' investors in these actions, pursuant to a contingency fee agreement. The agreement provided that Sherman was to receive forty percent of the amount of benefits paid to the plaintiffs after deducting litigation-related costs and disbursements. Also, the Oxford companies were to pay Sherman periodically throughout the litigation as an advance against his contingency fees, and any money Sherman retained in excess of his fees would be treated as an interest-free loan.

In early 2001, the Receiver settled the contingency suits. A year later, the Receiver filed a motion in the *Whitworth* suit seeking an order requiring Sherman to disgorge money he had received and retained, but not earned, in connection with his representation in the contingency suits. The SEC joined the motion shortly thereafter. Four days before the hearing on the disgorgement motion, Sherman and his wife, Andrea Sherman, filed a voluntary Chapter 7 bankruptcy petition with the bankruptcy court. Sherman did not file an opposition to the disgorgement motion with the *Whitworth* district court, nor did he appear at the hearing on the motion.

---

[4]We refer to this order as the "contempt judgment" or "contempt order."

[5]The district court's order appointing Lennon to be the permanent receiver referred to one of these cases. *See supra* note 2, ¶ G.

In March 2002, the *Whitworth* district court issued its decision on the disgorgement motion. It found that the Receiver was subject to the automatic stay provisions of 11 U.S.C. § 362(a)(1), but that, under § 362(b)(4), the SEC was not.[6] On the merits, the district court found that the Receiver had settled the contingency suits for $750,000, and that Sherman was therefore entitled to $300,000 in fees. The court also found that as of the time of the settlement, Sherman had collected $881,313.43 in advances. Thus, pursuant to the contingency

---

[6]Section 362 provides, in relevant part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301 [covering voluntary petitions] [or] 302 [covering joint petitions] . . . of this title . . . operates as a stay, applicable to all entities, of —

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

(b) The filing of a petition under section 301 [or] 302 . . . does not operate as a stay —

. . . .

(4) under paragraph (1) . . . of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power . . . .

11 U.S.C. § 362(a)(1), (b)(4). The question of the propriety of the stay ruling is not before us in this proceeding.

Unless otherwise indicated, all citations to the U.S. Code are to the version of the Code in effect at the time of the relevant lower court decisions in 2002. Later amendments to the Code are not relevant to our disposition of the present case and have therefore, with one exception, not been noted.

fee agreement, Sherman owed the Oxford companies $581,313.43, the difference between the advances Sherman had received and retained and the actual fee for his representation. The district court granted the motion for disgorgement (disgorgement judgment) and ordered Sherman to pay $581,313.43 plus interest. The disgorgement order did not specify to whom Sherman was to remit this money.

In May 2002, the SEC filed a motion in bankruptcy court to dismiss the Shermans' Chapter 7 petition pursuant to 11 U.S.C. § 707(a). The Receiver joined the motion shortly thereafter. A few weeks later, the Receiver independently filed an action (nondischarge action) against Sherman in bankruptcy court, seeking a determination that the debt Sherman owed the Receiver for the contempt judgment and the retention of money in excess of his fees in connection with the contingency suits, totaling $636,293.43, was nondischargeable.[7]

The bankruptcy court denied the SEC's motion to dismiss the bankruptcy in June 2002, stating that "[t]his is just a run-of-the-mill bankruptcy." The SEC filed a notice of appeal in July 2002. The appeal was heard by the *Whitworth* district court. On October 1, 2002, while the appeal was pending in the district court, the bankruptcy court entered an order granting the Shermans a discharge under 11 U.S.C. § 727.

In December 2002, Sherman and the Receiver entered into a settlement agreement (Agreement). As part of the Agreement, Sherman "agree[d] to execute a Stipulation for Entry of Judgment in the amount of $636,293.43 plus interest." The

---

[7]The Receiver's motion for non-discharge invoked 11 U.S.C. § 523(a)(4) and (6). The former exempts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The latter exempts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." *Id.* § 523(a)(6).

bankruptcy court entered an order shortly thereafter granting the stipulation for entry of judgment.

In relevant part, the stipulation stated the following:

A. On February 28, 2000, the U.S. District Court, Central District of California (the "District Court") in *SEC v. Whitworth Energy Resources* entered a contempt judgment against Defendant [Sherman] and various other individuals (the "Contempt Judgment"). The Contempt Judgment found that Defendant received $54,980 in violation of a TRO and Preliminary Injunction previously issued by the District Court.

B. In addition, the Receiver has asserted a claim against Defendant for $581,313.43 plus interest for attorneys' fees Defendant received as purported advances against an anticipated contingent fee (the "Disgorgement Claim").

. . . .

D. On May 24, 2002, Plaintiff [the Receiver] filed a complaint (the "Complaint") against Defendant pursuant to 11 U.S.C. Section 523 to determine the dischargeability of debts totaling $636,293.43 plus interest based on the Contempt Judgment and the Disgorgement Claim (the "Adversary Action").

. . . .

NOW THEREFORE, in consideration of the recitals set forth above, and in consideration of the mutual promises, undertakings, terms and conditions hereinafter set forth, the parties stipulate as follows:

1. Subject to the terms and conditions of the Settlement Agreement and for the sole purposes of the

Settlement Agreement, Defendant agrees and stipulates that the Contempt Judgment and Disgorgement Claim are nondischargeable pursuant to 11 U.S.C. § 523(a).

2. Defendant agrees to make payments totaling $50,000 to Plaintiff as follows in full and final settlement of Plaintiff's claims against Defendant as set forth in the Adversary Action . . . .

. . . .

3. Defendant stipulates to entry of a judgment in the amount of $636,293.43 plus interest (the "Judgment"), based on the following terms and conditions: As long as Defendant makes all payments . . . , Receiver shall forebear from filing, entering, recording, enforcing or executing on the Judgment. . . .

. . . .

5. Upon receipt of the Final Payment . . . , the Receiver shall immediately dismiss the Adversary Action.

The district court reversed the bankruptcy court's order denying the SEC's motion to dismiss the petition. The court concluded that there was no specific remedy under the Bankruptcy Code for the SEC to pursue, and that under our opinion in *Padilla*, it could therefore proceed to the "cause" inquiry. Analyzing the SEC's motion to dismiss the Shermans' petition for "cause" under § 707(a), the district court held that the timing and circumstances of the Shermans' petition, along with the misrepresentations made in it, were sufficient to constitute "cause." Specifically, the district court held that

Sherman filed for bankruptcy to prevent this Court from ordering Sherman to disgorge the funds he

> wrongfully obtained from the companies. By filing for bankruptcy, the Court finds that Sherman intended to obtain a discharge of his obligations to the SEC, while simultaneously — because he turned over no assets for liquidation — maintaining the lifestyle he currently enjoys, a lifestyle funded in part by the money Sherman obtained by deceiving his clients and by violating this Court's orders.

The district court therefore reversed the bankruptcy court and remanded with instructions to dismiss "for cause," pursuant to § 707(a). From this decision the Shermans timely appeal.

## II.   Standing

On appeal, the Shermans argue for the first time that the SEC lacks standing to seek dismissal of their Chapter 7 petition, because the SEC's interest in the contempt and disgorgement judgments was extinguished when the Receiver and Sherman entered into the Agreement.[8] We must address Arti-

---

[8]The prudential appellate standing doctrine, *see Fondiller v. Robertson* (*In re Fondiller*), 707 F.2d 441 (9th Cir. 1983), is not pertinent under the present circumstances. This doctrine provides that "[o]nly those persons who are directly and adversely pecuniarily affected by an order of the bankruptcy court . . . have standing to appeal that order." *Id.* at 442.

The doctrine of prudential appellate standing "exists to fill the need for an explicit limitation on standing to appeal in bankruptcy proceedings. This need springs from the nature of bankruptcy litigation which almost always involves the interests of persons who are not formally parties to the litigation." *Id.* at 443. We have not, however, invoked this doctrine in instances in which the appellant was the party that brought the motion at issue on appeal. Instead, we have invoked it when the appellant is a party other than the moving party. *See, e.g.*, *Duckor Spradling & Metzger v. Baum Trust* (*In re P.R.T.C., Inc.*), 177 F.3d 774, 776-77 (9th Cir. 1999); *Tilley v. Vucurevich* (*In re Pecan Groves of Ariz.*), 951 F.2d 242, 244 (9th Cir. 1991); *Fondiller*, 707 F.2d at 442. Here, the SEC brought the dismissal motion in the first place and therefore *was* formally a party to the dismissal litigation. We therefore conclude that the SEC need not establish prudential appellate standing in addition to Article III standing in the present case.

cle III standing questions regardless of whether they were raised below. *See Biggs v. Best, Best & Krieger*, 189 F.3d 989, 998 & n.7 (9th Cir. 1999).

To establish standing under Article III, a party

> must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

At argument, the SEC expressly waived any contention that its role as statutory guardian of the federal securities laws supplies a non-pecuniary interest sufficient to create standing. *Cf. SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459-60 (1940). Instead, the SEC now premises its standing solely on its asserted status as a "creditor" under the Bankruptcy Code with respect to the contempt and disgorgement judgments. The SEC argues that because it is a "creditor" under the Bankruptcy Code and its debts could be discharged if the petition is not dismissed, it has Article III standing.

We therefore must decide whether the SEC is a "creditor" for purposes of the Bankruptcy Code with respect to the contempt judgment or the disgorgement judgment. We conclude that the SEC is a creditor with respect to the disgorgement judgment. Because we so conclude, we do not reach the question of whether the SEC is also creditor with respect to the contempt judgment.[9] In Part II(A), we explain why the SEC

---

[9]The "creditor" analysis for the two judgments is slightly different. The contempt order in the *Whitworth* action, entered on a motion brought by

was a creditor under the Bankruptcy Code in the absence of a settlement agreement, and in Part II(B), we address why the Agreement between Sherman and the Receiver did not extinguish the SEC's right to enforce the disgorgement judgment.

## A. SEC's Right To Enforce the Disgorgement Judgment

[1] We first decide whether the SEC is a "creditor" for purposes of the Bankruptcy Code with respect to the disgorgement judgment, assuming the absence of a settlement agreement. Neither the Supreme Court nor any federal court of appeals has addressed the question whether the SEC can be a creditor under the Bankruptcy Code if the agency has obtained a monetary judgment entered in an SEC enforcement action. The Bankruptcy Appellate Panel of the Ninth Circuit and several bankruptcy courts have, however, concluded that the SEC can in such circumstances have standing as a creditor under the Bankruptcy Code. *See, e.g.*, *SEC v. Cross* (*In re Cross*), 218 B.R. 76, 78-80 (B.A.P. 9th Cir. 1998); *SEC v. Hodge* (*In re Hodge*), 216 B.R. 932, 935-36 (Bankr. S.D. Ohio 1998); *SEC v. Kane* (*In re Kane*), 212 B.R. 697, 700 (Bankr. D. Mass. 1997); *SEC v. Maio* (*In re Maio*), 176 B.R. 170, 171-72 (Bankr. S.D. Ind. 1994). In concert with these tribunals, we hold that in the present case, the SEC is a "credi-

---

the SEC and the Receiver, was premised on the finding that Sherman violated the freeze order in the SEC action. In the contempt order, the court required Sherman to pay $54,980 plus prejudgment interest "to the Receiver."

The disgorgement motion was granted only with respect to the SEC and did not specify who was to receive the disgorged funds. Furthermore, the legal theories underlying the Receiver's interest in the money at issue differed from the legal theory underlying the SEC's interest in the same money. *See infra* Part II(B).

tor" for purposes of the Bankruptcy Code, assuming the absence of a settlement agreement extinguishing its rights.[10]

**[2]** The Bankruptcy Code's definition of "creditor" includes an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."[11] 11 U.S.C. § 101(10)(A). The Code provides that the term " 'entity' includes . . . governmental unit," *id.* § 101(15), and the Code defines "claim" as a

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable

---

[10]The foregoing cases address whether the SEC has standing as a creditor under the Bankruptcy Code to file a complaint under 11 U.S.C. § 523 to determine the dischargeability of a particular debt. *See* 11 U.S.C. § 523(c); FED. R. BANKR. P. 4007(a) ("[A]ny *creditor* may file a complaint to obtain a determination of the dischargeability [under § 523] of any debt." (emphasis added)). In contrast, in the present case, the SEC argues that it has standing under the Bankruptcy Code to pursue the dismissal of the bankruptcy petition under 11 U.S.C. § 707(a), which does not in terms require that any motion be brought by a creditor. Nonetheless, the SEC's basis for asserting Article III standing is that it is a creditor for purposes of the Bankruptcy Code, so the pertinent standing considerations are the same.

[11]The Bankruptcy Act of 1898, in effect before the adoption of the Bankruptcy Code, defined a "creditor" as "anyone who *owns* a debt, demand, or claim provable in bankruptcy." 11 U.S.C. § 1(11) (1976) (repealed 1978) (emphasis added). Under the Code, the creditor is no longer required to "own" a claim, only to "ha[ve]" one. *See* 2 COLLIER ON BANKRUPTCY § 101.10 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005); *see also Fezler v. Davis* (*In re Davis*), 194 F.3d 570, 577 (5th Cir. 1999) (noting this difference). The change appears to accord with the broad definition of "claim" in the Code, which includes "the right to an equitable remedy." 11 U.S.C. § 101(5)(B).

> remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Id.* § 101(5). The Supreme Court has stated that "Congress intended by this language to adopt the broadest available definition of 'claim' " and has held that " 'right to payment' [means] nothing more nor less than an enforceable obligation." *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (alteration in original) (one set of internal quotation marks omitted) (quoting *Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)).

Applying these provisions to the present case, we see that whether the SEC is a creditor turns on whether it "has" a "right to payment" — i.e., an "enforceable obligation" — "against" the Shermans with respect to the disgorgement judgment. 11 U.S.C. § 101(10)(A), (5); *Johnson*, 501 U.S. at 83. This determination depends, in turn, on the nature of the disgorgement judgment entered in favor of the SEC, the consideration to which we now turn.

Under the Securities Act of 1933 (1933 Act) and the Securities Exchange Act of 1934 (1934 Act), "[w]henever it shall appear to the [SEC] that any person is engaged or is about to engage in acts or practices" that violate the securities laws, the SEC may bring an action "to enjoin such acts or practices." 15 U.S.C. § 78u(d)(1) (covering the 1934 Act); *see also id.* § 77t(b) (covering the 1933 Act and using materially identical language). Although injunctive relief is the only relief that the statutes expressly authorize, we have held that federal courts have "inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). In particular, a court may impose a receivership, *see id.*, freeze assets, *see SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003), *amended on other grounds on denial of reh'g*, 335 F.3d 834 (9th Cir.

2003), and order the disgorgement of the proceeds of fraud held by defendants, *see SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986), and by third-party nominal defendants, *SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir. 1998).

In the present case, the SEC brought the *Whitworth* action pursuant to its authority under 15 U.S.C. §§ 78u(d)(1) and 77t(b). The SEC obtained the disgorgement judgment against Sherman pursuant to *Colello*. *See id.* at 677. *Colello* authorizes courts to order the disgorgement of ill-gotten gains held by third parties who are acting as depositories and have no legitimate claim to the funds.[12] *See id*. Here, the $581,313.43 at issue in the disgorgement judgment was money Sherman retained in excess of his fee for the services rendered in the contingency suits. According to the contingency fee agreement, Sherman was to return this money to the Oxford companies. In the meantime, he was effectively acting as a depository for those funds, as he legitimately obtained them in the first place but no longer had a valid claim to retain them. Although the disgorgement motion was brought by both the Receiver and the SEC, the disgorgement judgment was rendered pursuant to the motion of the SEC alone, because the Receiver, but not the SEC, was subject to the automatic stay.

The pertinent question is whether the SEC's interest in the disgorgement judgment is sufficient to confer creditor status on it for purposes of the Bankruptcy Code even though the SEC was not to obtain any funds for its own coffers. In *Nathanson v. NLRB*, 344 U.S. 25 (1952), the Supreme Court considered the circumstances in which a governmental entity can, by virtue of its authority to require payments from one party to another, be a creditor under the Bankruptcy Act of 1898.[13] *Nathanson* held that the National Labor Relations

---

[12]The parties do not argue that the district court's disgorgement judgment was in error under *Colello*.

[13]The Bankruptcy Act provision at issue in *Nathanson* defined "creditor" slightly differently from the Code, as "anyone who owns a debt, demand, or claim provable in bankruptcy, . . . includ[ing] his duly authorized agent, attorney, or proxy." 11 U.S.C. § 1(11) (1946) (repealed 1978), *quoted in Nathanson*, 344 U.S. at 27 n.1.

Board (Board) was a creditor under the Bankruptcy Act with respect to the Board's order to a debtor to pay certain employees back pay, notwithstanding that it was the employees, and not the Board, who would eventually receive the money at issue. *See id.* at 26-27. The Court reasoned as follows:

> The Board is the public agent chosen by Congress to enforce the National Labor Relations Act. A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice. Congress has made the Board the only party entitled to enforce the Act. A back pay order is a command to pay an amount owed the Board as agent for the injured employees. The Board is therefore a claimant in the amount of the back pay.

*Id.* at 27 (citations omitted).

Under *Nathanson*, the SEC has standing as a creditor with respect to these judgments. Like the Board in *Nathanson*, the SEC in the present case "is the public agent chosen by Congress to enforce" the securities laws. *Id.* In addition, the disgorgement judgment is "designed to vindicate the public policy of the statute." *Id.* As we explained in *SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993), "[b]y deterring violations of the securities laws, disgorgement actions further the [SEC's] public policy mission of protecting investors and safeguarding the integrity of the markets." *Id.* at 1491. In *Colello*, we explained that "the SEC may name a non-party depository as a nominal defendant to effect full relief in the marshalling of assets that are the fruit of the underlying fraud." 139 F.3d at 677.

The present case may at first seem different from *Nathanson* in two respects. First, *Nathanson* noted that the Board was the "*only* party entitled to enforce the" statute at issue, 344 U.S. at 27 (emphasis added), but the SEC is not the only

enforcer of some of the sections of the statute at issue in the *Whitworth* action. In the *Whitworth* action, the SEC was enforcing two statutes and one rule promulgated thereunder: section 17(a) of the 1933 Act, section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder. While there is no express private cause of action under any of these provisions and no implied private cause of action under section 17(a) of the 1933 Act, *see Puchall v. Houghton, Cluck, Coughlin & Riley* (*In re Wash. Pub. Power Supply Sys. Sec. Litig.*), 823 F.2d 1349, 1357-58 (9th Cir. 1987) (en banc), there is an implied private cause of action under section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 (1983); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). Second, *Nathanson* stated that "[a] back pay order is a command to pay an amount *owed the Board as agent* for the injured employees," 344 U.S. at 27 (emphasis added), but the disgorgement order in the present case is not to be paid directly to the SEC as agent for the injured investors. As explained below, however, we conclude that these possible distinctions lack force, and that the SEC has creditor status under the Bankruptcy Code.

First, that the SEC is not the sole enforcer of all sections of the statute at issue in the *Whitworth* action does not deprive the SEC of creditor status. The two circuits that have addressed whether an entity can be a creditor if it is not the sole enforcer of a statute have come to conclusions in some tension with each other.[14] *Compare Davis*, 194 F.3d at 575 ("[A]gencies need not be the only party entitled to enforce the Acts as their standing as creditors in the nondischargeability actions obtains regardless of whether the actual beneficiaries were authorized under federal law to prosecute the action in

---

[14]Several bankruptcy courts have held that the fact that the SEC is not the sole enforcer of the securities laws does not deprive the SEC of creditor status under *Nathanson*. *See Hodge*, 216 B.R. at 936; *Kane*, 212 B.R. at 700; *Maio*, 176 B.R. at 171-72.

their own right."), *with*, *Missouri ex rel. Ashcroft v. Cannon* (*In re Cannon*), 741 F.2d 1139, 1142 (8th Cir. 1984) (holding that the state of Missouri was not a creditor under the statute at issue and distinguishing *Nathanson* by noting, among other differences, that "under the Missouri statutory scheme, the Attorney General is not the only party entitled to enforce" the statute because it "provides for a private right of action").[15] In accordance with the Fifth Circuit's opinion in *Davis*, we hold that the fact that the SEC is not the sole enforcer of the securities laws does not deprive it of creditor status.

To hold otherwise "would be contrary to legislative intent." *Maio*, 176 B.R. at 172. Congress created an express cause of action for violations of section 17(a) of the 1933 Act, section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder, but it did so only for the SEC, not for private parties. *See* 15 U.S.C. § 77t(b) (expressly creating a cause of action for the SEC under the 1933 Act); *id.* § 78u(d)(1) (expressly creating a cause of action for the SEC under the 1934 Act and rules promulgated thereunder). And, although courts have implied a private cause of action under section 10(b) of the 1934 Act and Rule 10b-5, *see Herman & MacLean*, 459 U.S. at 380, they have not done so under section 17(a) of the 1933 Act, *see Puchall*, 823 F.2d at 1353-58. By creating an express cause of action only for the SEC under these sections and by implicitly precluding a private cause of action under section 17(a) of the 1933 Act, Congress evinced an intent not to leave enforcement of the securities laws to private parties.

---

[15]*Davis* distinguished *Cannon* as a case in which:

> the Attorney General of Missouri lacked standing to object to the discharge of debts owed by the debtor to eight individuals under the Missouri Merchandising Practicing Act because the Act did not grant him authority to sue on behalf of private individuals in a private action to seek the restitution payments; rather, the Attorney General could only seek an injunction on behalf of the state itself prohibiting the underlying unlawful practice.

*Davis*, 194 F.3d at 576. That distinction holds here as well, as the SEC, like the Administratrix in *Davis*, is not limited to injunctive relief.

**[3]** To hold that, nonetheless, the SEC has lesser status in bankruptcy proceedings when private enforcement is permitted would both reverse Congress's assignment of basic enforcement authority to the SEC and "unduly hinder enforcement of the Securities Act." *Maio*, 176 B.R. at 172. That private parties may have been able to bring actions seeking payment of some or all of the money at issue in the disgorgement judgment should not affect the SEC's ability to enforce the disgorgement order that it did obtain. Otherwise, the ultimate enforcement of securities laws would depend, in part, on potential action by private parties, as only private parties to securities actions could have creditor status in bankruptcy, participate in distribution of the estate, and file nondischarge actions. Yet, the decided congressional preference was for SEC enforcement of securities laws. Private parties may not always have the incentive or financial wherewithal to enforce those laws, and can only do so to the extent that they can recover for their own losses. *See DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1446 (9th Cir. 1996). We therefore hold that the fact that the SEC is not the sole enforcer of the securities laws does not deprive it of creditor status.

**[4]** Nor does it matter to the SEC's status as a creditor that the Receiver may have an enforceable interest as well in the disgorgement judgment. That judgment does not make clear to whom the money at issue is to be paid. Even if the Receiver could enforce the disgorgement judgment on the ground that he was the intended recipient of the funds at issue, the Receiver's right to enforce the judgment should not strip the SEC of *its* right to do so. We agree with the Bankruptcy Appellate Panel of the Ninth Circuit's reasoning in *Cross*:

> As the chief enforcer of the securities laws, the [SEC] should not have to depend on the Receiver to enforce its judgments. In some cases, limited funds in the receivership estate might actually prevent the Receiver from doing so. This result, however, conflicts with the Commission's role as a statutory

guardian charged with safeguarding the public inter-
est. In addition, any costs incurred by the receiver-
ship estate in connection with enforcing the
Disgorgement Judgment would reduce recovery to
the defrauded investors in this case, whereas allow-
ing the Commission to proceed preserves resources.

218 B.R. at 79.

Second, while *Nathanson* stated, vaguely, that "a back pay
order is a command to pay an amount *owed the Board as
agent* for the injured employees," 344 U.S. at 27 (emphasis
added), the fact that the disgorgement order in the present
case is not paid to the SEC, even in the first instance, does not
affect the SEC's creditor status. As an initial matter, we do
not read the quoted statement in *Nathanson* as indicating that
the funds were literally to be paid to the Board. Earlier in the
opinion, the Court characterized the Board's order by noting
that the Board "ordered the bankrupt *to pay certain employees*
back pay." *Id.* at 26 (emphasis added). Furthermore, the
underlying Board order at issue in *Nathanson* stated that the
respondent companies were to "make [the discriminatees]
whole for any loss of pay . . . *by payment to each of them* of
a sum of money." *In re Hill Transp. Co.*, 75 N.L.R.B. 1203,
1216 (1948) (emphasis added).[16] Thus, *Nathanson* could not
have meant that the Board had creditor status because pay-
ment was *actually* to be deposited with the Board, as the order
in question did not so require. It must have meant merely that

[16]The National Labor Relations Board Compliance Manual in effect
today requires that, absent exceptional circumstances, respondents pay
injured employees by issuing them a check and sending the check to the
Board for delivery, or by directly paying the discriminatees. *See* NAT'L
LABOR RELATIONS BOARD, CASEHANDLING MANUAL (PART THREE), COMPLI-
ANCE PROCEEDINGS §§ 10635.1-.4 (1993), *available at* http://www.nlrb.gov/
nlrb/legal/manuals/chm3-11.pdf (describing the usual payment proce-
dures); *id.* §§ 10640.1-.2 (describing the circumstances in which payment
is made to the Board).

the back pay order was to be *considered*, for purposes of the Bankruptcy Act, as an "amount owed the Board."

Moreover, even if the Court in *Nathanson* did assume that the payment *was* to be made to the Board in the first instance, we do not think creditor status could turn on that circumstance. Whether a governmental agency initially collects a back pay award for distribution to the directly affected individuals or, instead, simply obtains in its name an equitable order requiring payments directly to private individuals does not in any meaningful way affect the agency's interest in the money in question. In either instance, the authority to *enforce* the order to make payment of funds resides in the holder of the judgment — in *Nathanson*, the Board, here, the SEC. In either instance, the agency does not end up with the funds, but assures that affected individuals are compensated. And in either event, the agency has an "enforceable obligation" to require the debtor to pay money, *Johnson*, 501 U.S. at 83, the sine qua non of creditor status.

**[5]** Thus, the fact that the disgorgement judgment did not order that Sherman deposit the money at issue with the SEC does not affect the SEC's creditor status. *Cf. Cross*, 218 B.R. at 79 ("The Receiver's role as depository [for disgorged funds] . . . did not deprive the [SEC] of creditor status [for purposes of a § 523 dischargeability action related to a disgorgement judgment].")[17]

**[6]** We conclude that the SEC is a "creditor" in the present case, as that term is used by the Bankruptcy Code, unless the

---

[17]*Cannon* did accord significance to its understanding that in *Nathanson*, the money was to be passed through the agency. *See Cannon*, 741 F.2d at 1142 (holding that the state of Missouri was not a creditor under the statute at issue and distinguishing *Nathanson* by stating that in contrast to *Nathanson*, "[i]n this case the state court specifically ordered restitution be made to the individuals"). However, as noted, *Cannon* involved a different statutory scheme than the one at issue here, and also, in our view, did not properly understand *Nathanson*.

Agreement extinguished its interest in the disgorgement judgment, a consideration to which we now turn.

### B.    Whether the Agreement Extinguished the SEC's Rights

We conclude that the Agreement, entered into after the bankruptcy court denied the SEC's dismissal motion, did not extinguish the SEC's right to enforce the disgorgement judgment. First, the Receiver did not purport to settle the SEC's claim. Second, the Receiver and the SEC are independent entities, and the Receiver did not have the authority to compromise the SEC's claim. Third, the rights at issue in the Agreement are different from the rights at issue in the disgorgement judgment.

[7] As to the first point, the Receiver did not purport to settle the SEC's claim with respect to the disgorgement judgment. Although the Agreement was reached while the SEC's appeal of its motion to dismiss was pending, the SEC was not a party to the Agreement. Only Sherman and the Receiver were parties. In addition, the Agreement stated that "[e]ach of the Parties to this Agreement acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, inducement or warranty whatsoever, express or implied, which is not expressly contained in this Agreement." The SEC thus never itself relinquished its rights to enforce the disgorgement judgment or to pursue its motion to dismiss the bankruptcy petition, and the Agreement so recognized.

Moreover, the only pending action addressed in the Agreement was the Receiver's nondischarge action. The stipulation filed pursuant to the Agreement noted that Sherman's payments would be "in full and final settlement of [the Receiver's] claims against Defendant as set forth in the [Receiver's nondischarge action]." The SEC's disgorgement judgment was not at issue in the nondischarge action. Instead, the non-

discharge action involved only a separate, unadjudicated claim, albeit for the same money at issue in the disgorgement judgment: The stipulation stated that "the Receiver has asserted a *claim* against Defendant for $581,313.43 plus interest for attorneys' fees Defendant received as purported advances against an anticipated contingent fee (the 'Disgorgement Claim')," and noted that the Receiver's nondischarge action was based on the "Contempt *Judgment* and the Disgorgement *Claim*." (emphasis added). The SEC's pending appeal of the bankruptcy court's denial of its motion to dismiss is not mentioned in the stipulation or in the Agreement, nor is the disgorgement *judgment* in favor of the SEC.[18] Thus, the Receiver did not purport to compromise the disgorgement judgment entered in favor of the SEC.

**[8]** As to the second point, the Receiver had no authority to compromise claims of the SEC. True, the Receiver was appointed pursuant to the SEC's motion, but the Receiver's authority is circumscribed by the order appointing him. That order makes clear that he is to marshal the assets of the receivership estates and can bring actions to do so, but it does not give him authority to compromise judgments in favor of the SEC or otherwise act on behalf of the agency. Thus, the Receiver did not have the authority to settle the SEC's claims against Sherman.

**[9]** Finally, as to the third point, the rights at issue in the Agreement were not the same as the rights at issue in the SEC's disgorgement judgment, and the latter rights were not fully extinguished when the former rights were. The SEC and the Receiver played different roles with respect to the money

---

[18]While the stipulation filed pursuant to the Agreement states that Sherman "agree[d] and stipulate[d] that the Contempt Judgment and Disgorgement Claim are nondischargeable pursuant to 11 U.S.C. § 523(a)," this stipulation was "for the sole purposes of the Settlement Agreement." The SEC, therefore, may not — and has not attempted to — prevail on the theory that the debts have been deemed nondischargeable.

at issue in the disgorgement judgment and had interests in the money predicated on separate legal theories. The Receiver's claim for this money stemmed from his role as the collector of the assets of the corporations and was premised on two independent theories for collecting the money: (1) the Receiver was entitled to the money under the terms of the contract Sherman and the Oxford companies entered into for Sherman's representation in the contingency suits; and (2) the Receiver was entitled to the money under the California Rules of Professional Conduct, which state that attorneys shall "[p]romptly pay or deliver, as requested by the client, any funds . . . in the possession of the [attorney] which the client is entitled to receive." CAL. RULES OF PROF'L CONDUCT R. 4-100(B)(4), *available at* http://www.calbar.ca.gov/calbar/pdfs/ethics/2006_Rules-Prof-Conduct.pdf.

In contrast, the SEC's claim to this money stemmed from its role as the public enforcer of the federal securities laws and was obtained under a *Colello* theory. Under *Colello*, so long as Sherman retained some of the funds fraudulently obtained by his clients as a deposit on possible future fees, the SEC retained an interest in requiring that he disgorge those funds. Such a disgorgement would further the SEC's goals of deterring securities laws violations and compensating defrauded investors. *See Colello*, 139 F.3d at 677. That the Receiver recovered some of the money at issue in the disgorgement judgment to settle his contract and ethics claims does not mean that the SEC's securities law claim was extinguished.[19]

---

[19]We note that while the Agreement did not extinguish the SEC's interest in the disgorgement judgment, it may have affected the amount of money that the SEC could require Sherman to pay. Under the federal securities laws, the SEC is entitled to seek the disgorgement of ill-gotten gains only for the purpose of preventing unjust enrichment, not as a penalty. *See Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (holding that the disgorgement judgment is not "a *fine* levied against the petitioners as *punishment* for their conduct" but rather "is the means by which the petitioners are required to remedy the unjust enrichment"). It follows that the amount of money Sherman can be required to pay must be offset by any

**[10]** For all of these reasons, the Agreement did not entirely extinguish the SEC's right to enforce the disgorgement judgment. The SEC is therefore a creditor under the Bankruptcy Code with respect to the disgorgement judgment.

**[11]** As a creditor, the SEC has Article III standing to pursue the dismissal of the Shermans' bankruptcy petition because, given that status, it satisfies all three prongs of the Article III standing test. First, the SEC suffered the requisite "injury in fact" because the pendency of the bankruptcy action did affect the SEC's ability to enforce its judgments: If the bankruptcy petition was not dismissed, Sherman's debt resulting from the SEC's disgorgement judgment, like all of his other debts, might be discharged. Second, the SEC's injury is "fairly traceable" to the Shermans' bankruptcy petition, *City of Sausalito*, 386 F.3d at 1197 (internal quotation marks omitted), because the filing of the bankruptcy petition made it likely that the disgorgement judgment would not be fully paid. Third, "it is likely, as opposed to merely speculative" that the SEC's injury will be redressed by a favorable decision, as such a result would mean that the disgorgement judgment will not be discharged in bankruptcy. *Id.* (internal quotation marks omitted).

## III. Mootness[20]

---

amount already disgorged pursuant to the Agreement. *See Cross*, 218 B.R. at 80 ("Both the Receiver and the Commission are entitled to only a single non-duplicative recovery."); *see also SEC v. Penn. Cent. Co.*, 425 F. Supp. 593, 599 (E.D. Pa. 1976) (holding that when the SEC seeks disgorgement and some money has been disgorged pursuant to a private law suit involving the same allegations, the amount paid in the private law suit must offset the judgment for disgorgement sought by the SEC); *cf. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) ("[O]nce ill-gotten gains have been disgorged to the SEC, there remains no unjust enrichment and, therefore, no basis for further disgorgement in a private action.").

[20]The Shermans raise the mootness argument for the first time in their reply brief filed with this court. Although we ordinarily do not address

The Shermans argue that even if the SEC did have standing, this appeal is moot because the bankruptcy court has already entered an order granting them a discharge under 11 U.S.C. § 727. We conclude, however, that although the bankruptcy court retained jurisdiction to enter an order granting the discharge while the SEC appealed the denial of its motion to dismiss, this appeal is not moot because the entry of a discharge order alone did not terminate the Shermans' bankruptcy petition, and a grant of the dismissal order could have triggered reconsideration of the discharge order.

**[12]** Federal Rule of Bankruptcy Procedure 4004 determines when a bankruptcy court may grant a discharge under 11 U.S.C. § 727. The version of Rule 4004(c) in effect prior to the Shermans' discharge stated that on the "expiration of the time fixed for filing a complaint objecting to discharge and the time fixed for filing a motion to dismiss the case under Rule 1017(e) [which governs motions to dismiss under § 707(b)], the court shall forthwith grant the discharge," unless one of several conditions exists, none of which are present in the instant case. FED. R. BANKR. P. 4004(c) (2000) (amended 2002).[21]

Rule 4004(a) states that a "complaint objecting to the debtor's discharge under § 727(a) of the Code shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)." FED. R. BANKR. P. § 4004(a). It appears that the first date set for the meeting of creditors was March 25, 2002. The expiration of the time fixed for filing a

issues raised for the first time in reply briefs, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999), mootness is a jurisdictional issue under Article III and one we therefore must resolve, *see Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir. 1999).

[21]Rule 4004(c) was amended in 2002 to add as an exception that a motion to dismiss under § 707(a) is pending. *See* FED. R. BANKR. P. 4004(c) (Supp. II 2002). That amendment was not effective, however, until December 1, 2002, after the purported discharge in this case. *See id.*

complaint was therefore May 24, 2002. *See* FED. R. BANKR. P. 9006(a) (describing rules for time computations).

Because none of the conditions listed in Rule 4004(c) applied to the present case, Rule 4004(c) called for the bankruptcy court to grant the discharge "forthwith" — that is, soon after May 24, 2002, the end of the sixty-day objection period. At that time, the SEC's motion to dismiss was pending in the bankruptcy court. The bankruptcy court did not, however, enter a formal order granting the discharge until October 1, 2002. By that date, the bankruptcy court had denied the SEC's motion to dismiss, the SEC had filed a notice of appeal, and the appeal of the denial of the motion to dismiss was pending in the district court. No party objected to the delay in issuing the discharge order.

The Shermans argue that although the bankruptcy court did not enter a formal order granting the discharge until October 1, 2002, we should deem the discharge to have been entered on the first business day following the date the sixty-day period expired, citing *Ross v. Mitchell* (*In re Dietz*), 914 F.2d 161 (9th Cir. 1990), for this proposition. As the sixty-day period expired on May 24, 2002, the discharge, using that approach, would be deemed entered on May 28, 2002.[22] Citing *In re Morgan*, 290 B.R. 246 (Bankr. D. Del. 2003), the Shermans argue that this case is moot because the discharge was deemed granted while the motion to dismiss was pending in bankruptcy court, prior to the date that the SEC filed its notice of appeal of the denial of the motion to dismiss.

While the argument is creative, we cannot accept it. The statute says nothing about an automatic discharge, nor does it specify a date on which a discharge is "deemed" to occur, without an order so stating. Where, as here, a motion that would obviate the viability of a discharge order was pending

---

[22]May 24, 2002, was a Friday, and May 27, 2002, was Memorial Day, so the next business day after May 24, 2002, was May 28, 2002.

when the sixty-day period expired, there was good reason for the bankruptcy court to refrain from issuing a discharge order. Moreover, *Dietz* did not hold that the discharge *must* be deemed to have been entered upon the expiration of the sixty-day period. Rather, *Dietz* held that a bankruptcy court *may* deem the discharge to have been entered at that time, as doing so is ordinarily "consistent[ ] with the spirit of the bankruptcy rules." 914 F.2d at 164. In *Dietz*, the bankruptcy court itself retroactively deemed the discharge to have been entered upon the expiration of the sixty-day period, so that it could cure a statutory gap that would have otherwise precluded a motion to revoke the discharge; there was no other later order that purported to be an order of discharge. *See id.* We upheld the bankruptcy court's discretion to deem the discharge to have been entered upon the expiration of the sixty-day period. *See id.*

In the present case, in contrast, the record does not reveal that the bankruptcy court ever deemed the discharge to have been entered at any time prior to the formal order granting the discharge, issued on October 1, 2002. Indeed, there would have been no reason to enter the October 1 order if the bankruptcy court believed that there had been a "deemed" discharge months earlier. We therefore consider the discharge entered on October 1, 2002, not earlier.

**[13]** The discharge order was entered, then, after the SEC filed its notice of appeal. We conclude that the bankruptcy court nonetheless retained jurisdiction to enter the discharge order but that under the particular facts of this case, the appeal is not moot.

The timely filing of a notice of appeal to either a district court or bankruptcy appellate panel will typically divest a bankruptcy court of jurisdiction "over those aspects of the case involved in the appeal." *See Padilla*, 222 F.3d at 1190; 10 COLLIER ON BANKRUPTCY ¶ 8001.04 (15th ed. 2006). The bankruptcy court retains jurisdiction over all other matters

that it must undertake "to implement or enforce the judgment or order," although it "may not alter or expand upon the judgment." *See Padilla*, 222 F.3d at 1190. If a party wants to stay all of the proceedings in bankruptcy court while an appeal is pending, it must file a motion for a stay. *See* FED. R. BANKR. P. 8005 (instructing the appealing party to file "[a] motion for a stay of the judgment, order, or decree of a bankruptcy judge . . . pending appeal").[23] In the instant case, the SEC did not obtain such a stay. As a result, the bankruptcy court retained jurisdiction to enter the discharge order; the only matter over which it lacked jurisdiction was the motion to dismiss — the very order being appealed. *See In re Combined Metals Reduction Co.*, 557 F.2d 179, 201-03 (9th Cir. 1977) (holding that the lower court lacked jurisdiction to vacate an order that had been appealed once the notice of appeal had been filed, but also recognizing that the bankruptcy court, absent a stay, could continue to exercise jurisdiction over other proceedings related to the petition).[24]

---

[23]The role of the stay is further underscored by 28 U.S.C. § 158(d)(2)(D). Under that statutory provision,

> [a]n appeal under this paragraph [to the court of appeals] does not stay any proceedings of the bankruptcy court, the district court, or the bankruptcy appellate panel from which the appeal is taken, unless the respective bankruptcy court, district court, or bankruptcy appellate panel, or the court of appeals in which the appeal is pending, issues a stay of such proceeding pending the appeal.

Section 158(d)(2)(D) was not enacted until 2005 and, therefore, does not apply to the Shermans' petition.

[24]In contrast, in *Padilla*, we held that the bankruptcy court lacked jurisdiction to enter the discharge order while the appeal was pending, thus rendering the discharge order void and the appeal not moot. 222 F.3d at 1189. The appeal in *Padilla*, however, stemmed from the bankruptcy court's decision to *grant* a motion to dismiss. *Id.* at 1188. Such an order is a final one. *Id.*; *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 911 (9th Cir. 1988). A decision to *deny* a motion to dismiss, on the other hand, is an interlocutory order. *See New Life Health Ctr. Co. v. IRS (In re New Life Health Ctr. Co.)*, 102 F.3d 428, 428 (9th Cir. 1996); *Dunkley v. Rega Props., Ltd. (In re Rega Props., Ltd.)*, 894 F.2d 1136, 1138-39 (9th Cir.

Despite this set of circumstances, this appeal is not moot. A bankruptcy court proceeding is not moot even after a discharge order has been entered so long as "the appellate court [can] fashion relief that is both effective and equitable." *See Spirtos v. Moreno (In re Spirtos)*, 992 F.3d 1004, 1006 (9th Cir. 1993). In determining whether effective and equitable relief is available, we consider first, (1) whether both parties are still before the court, and (2) whether they were both aware of the pending appeal. *See id.* at 1007 (holding that it could address the merits on appeal because both parties were part of the appeal, and because it was the debtor who "filed a notice of appeal to this court long after the assets [at issue] were distributed"); *Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.)*, 718 F.2d 322, 326 (9th Cir. 1983); *Credit Alliance Corp. v. Dunning-Ray Ins. Agency, Inc. (In re*

---

1990). The appeal from the bankruptcy court's final order divested the bankruptcy court of its jurisdiction to enter the discharge order*, see Padilla*, 222 F.3d at 1189, but that same result is not achieved when an interlocutory order is appealed absent a stay of the proceedings.

We note that the interlocutory nature of the bankruptcy court's order does not affect our jurisdiction to hear this appeal. Although a court of appeals cannot directly review a bankruptcy court's interlocutory order, *see* 28 U.S.C. § 158(a), we have jurisdiction to hear the instant appeal under 28 U.S.C. § 1291, which gives "courts of appeals . . . jurisdiction of appeals from all final decisions of the district courts of the United States." This is true, even when the district court is acting in its bankruptcy appellate capacity. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (rejecting the argument that it could not rely on § 1291 as its jurisdictional basis when reviewing "orders issued by district courts sitting pursuant to § 158(a) as courts of appeals in bankruptcy," and explaining that "[§] 1291 confers jurisdiction over appeals from 'final decisions of the district courts' acting in any capacity"); *Vylene Enters., Inc. v. Naugles, Inc. (In re Vylene Enters., Inc.)*, 968 F.2d 887, 891 (9th Cir. 1992) ("Section 1291 affords us jurisdiction over final orders of the district court, whether the district court rendered the order in its bankruptcy trial or bankruptcy appellate capacity." (citing to *Germain*, 503 U.S. at 253)). Here, the district court's decision to reverse the bankruptcy court's denial of the SEC's motion to dismiss is undeniably a final one, a point that neither party disputes.

*Blumer)*, 66 B.R. 109, 113 (B.A.P. 9th Cir. 1986). Here, both the SEC and the Shermans remain parties to the appeal and both parties knew that the motion to dismiss was still being litigated. In fact, like the debtor in *Spirtos*, the Shermans filed the notice of appeal before this court.

We next consider whether there would be the possibility of effective relief were we to reverse the bankruptcy court's decision. *See Spirtos*, 992 F.3d 1004, 1006. Here, such relief was a possibility because the entry of a discharge order alone does not irrevocably terminate bankruptcy proceedings. *See Martinson v. Michael (In re Michael)*, 163 F.3d 526, 529 (9th Cir. 1998) ("A case is not closed simply because a discharge of the debtor has been granted."); *In re Myatt*, 101 B.R. 197, 199 (Bankr. E.D. Cal. 1989). Instead, a Chapter 7 bankruptcy proceeding is only officially closed after a final report has been filed and the estate has been certified as "fully administered." *See* 11 U.S.C. § 350(a); FED. R. BANKR. P. 5009. The Shermans' bankruptcy petition, therefore, valid discharge order notwithstanding, remained open during the appeal and subject to the jurisdiction of this court. *Contra Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 797 (9th Cir. 1981) (holding that a case was moot, but only because the reorganization plans had been implemented to the point where it was impossible to fashion effective relief). Were we to affirm the district court and grant the SEC's motion to dismiss the Shermans' petition, all recourse by the SEC would not have been foreclosed: The agency could have relied, for example, on Rule 60(b) of the Federal Rules of Civil Procedure to obtain relief from the bankruptcy court's discharge order on the ground that that court's denial of the motion to dismiss was in error. *See* FED. R. BANKR. P. 9024 (allowing a party to use Rule 60 of the Federal Rules of Civil Procedure to apply for relief from a judgment or order).[25]

---

[25]In particular, in this hypothetical scenario, the SEC could move for relief under either Rule 60(b)(5) — which grants relief, in part, because

**[14]** In short, while the bankruptcy court retained jurisdiction to enter the discharge order on October 1, 2002, this case is not moot because entry of the discharge order alone did not irrevocably terminate the bankruptcy proceedings, thus leaving us able to fashion effective and equitable relief.

## IV.    Dismissal "for Cause"

This multitude of preliminaries over, we now reach the merits of the appeal: Should the SEC's motion to dismiss the petition "for cause" under 11 U.S.C. § 707(a) have been granted, as the district court maintained, or not, as the bankruptcy court decided?[26] We hold that the bankruptcy court did not err in denying the SEC's motion to dismiss the bankruptcy petition. In so holding, we do not suggest that *no* vehicles were available to the SEC to ensure that Sherman paid the contempt and disgorgement judgment debts or to sanction Sherman for the behavior that the district court found reprehensible. To the contrary, our holding is that the SEC and the district court chose the wrong vehicle — § 707(a) — for ensuring that Sherman paid the contempt and disgorgement judgment debts and did not misuse the bankruptcy process.

---

"it is no longer equitable that the judgment should have prospective application" — or Rule 60(b)(6) — which allows a party to request relief for "any other reason justifying relief from the operation of the judgment." *See* FED. R. CIV. P. 60(b). *See, e.g.*, *Walsh v. Bracken (In re Davitch)*, 336 B.R. 241, 254-55 (Bankr. W.D. Pa. 2006) (vacating a discharge order by relying on Rule 60(b)(6)); *Fonner v. Overdorf (In re Fonner)*, 262 B.R. 350, 356 (Bankr. W.D. Pa. 2001) (using Rule 60(b)(6) to modify a discharge order where "[f]ailure to do so would serve an unconscionable injustice under the circumstances presented here").

[26]The SEC's sole argument regarding the merits is that the petition should be dismissed "for cause" under § 707(a). The bankruptcy court declined to dismiss the petition; it was the district court on appeal that ordered dismissal. We therefore do not reach the question of whether the bankruptcy court in this case would have had inherent authority to dismiss the petition as filed in bad faith. *See Padilla*, 222 F.3d at 1193 n.6; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196-97 (9th Cir. 2003).

We review the district court's decision on appeal from a bankruptcy court de novo. *See Preblich v. Battley*, 181 F.3d 1048, 1051 (9th Cir. 1999). We review the bankruptcy court's conclusions of law de novo. *See Hanf v. Summers* (*In re Summers*), 332 F.3d 1240, 1242 (9th Cir. 2003). Thus, we review de novo whether a *type* of misconduct can constitute "cause" under § 707(a). *Cf. Padilla*, 222 F.3d at 1190-91 ("In essence, we review de novo whether the bankruptcy court erred in concluding that bad faith is a ground for dismissal under § 707(a)."). Having done so, we review a bankruptcy court's decision to grant or deny a motion to dismiss for misconduct that constitutes "cause" for abuse of discretion. *See Price v. U.S. Tr.* (*In re Price*), 353 F.3d 1135, 1138 (9th Cir. 2004) (holding, in a case addressing § 707(b), that "[w]e review a bankruptcy court's decision to dismiss a case for abuse of discretion").

**[15]** Under § 707(a), a "court may dismiss a case under this chapter only after notice and hearing and only for cause, including" three enumerated causes. 11 U.S.C. § 707(a); *see also Padilla*, 222 F.3d at 1193 (holding that "cause" rather than "bad faith" is the proper standard for evaluating a motion to dismiss under § 707(a)). No party contends that any of the three "causes" listed in § 707(a) apply to the present case.[27]

---

[27]Section 707(a) provides, in full:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including —

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee.

11 U.S.C. § 707(a).

**[16]** That being so, *Padilla* prescribes a two-part inquiry: First, we must consider whether the circumstances asserted to constitute "cause" are "contemplated by any specific Code provision applicable to Chapter 7 petitions." *Id.* If the asserted "cause" is contemplated by a specific Code provision, then it does not constitute "cause" under § 707(a). *See id.* at 1194. If, however, the asserted "cause" is not contemplated by a specific Code provision, then we must further consider whether the circumstances asserted otherwise meet the criteria for "cause" for discharge under § 707(a). *See id.* at 1193-94.

The SEC alleges that the Shermans engaged in three interrelated types of misconduct that together constitute "cause." First, the SEC alleges that "the Shermans used the bankruptcy as a refuge from the district court's jurisdiction, and to thwart the Commission's efforts to obtain a disgorgement judgment." Second, the SEC alleges that the Shermans used the bankruptcy as a " 'scorched earth' tactic" to disfavor the SEC.[28] Third, the SEC alleges that the Shermans "deliberately exaggerated their liabilities and expenses in order to create the misleading impression that they were in dire financial need of bankruptcy relief."

The only sensible way to approach the first part of the *Padilla* inquiry is to examine whether other specific Code

---

[28]The SEC does not explain what it means by " 'scorched earth' tactic." It is likely the SEC used this vague term to bring the Shermans' conduct within the reach of *Huckfeldt v. Huckfeldt* (*In re Huckfeldt*), 39 F.3d 829 (8th Cir. 1994), which suggests that "using bankruptcy as a 'scorched earth' tactic against a diligent creditor" can constitute "cause" for dismissal under § 707(a). *Id.* at 832. We assume that when the SEC states that the Shermans used bankruptcy as a " 'scorched earth' tactic," it means that the Shermans structured their financial transactions so as to pay debts owed to other creditors to the maximum extent possible but to avoid paying debts owed to the SEC. In particular, the SEC intimates that the Shermans depleted their assets so that no assets were left for the SEC once they filed for bankruptcy. For convenience, we will refer to this preference prong of the SEC's argument as the "scorched earth" theory of cause, even though the terminology is not particularly descriptive.

provisions address the *type* of misconduct alleged, not whether other specific provisions covering the *actual* misconduct alleged would give rise to relief under the Code. If another Code provision addresses the general type of misconduct but does not cover the actual misconduct, that omission is best understood as demonstrating that Congress did not mean to reach the actual misconduct at issue. Any other approach would preclude bankruptcy relief in circumstances in which all indications suggest that Congress made a considered decision about the coverage of the Code and intended to *provide* bankruptcy relief.

We assume, but do not decide, that the record substantiates that the Shermans engaged in the three types of misconduct the SEC alleges. So assuming, we hold that the asserted misconduct cannot constitute "cause" under § 707(a). These three types of misconduct are each contemplated by a specific Bankruptcy Code provision, and therefore, under *Padilla*, cannot constitute "cause" for § 707(a) purposes.

**[17]** First, § 362 addresses misconduct related to using bankruptcy as a refuge from the jurisdiction of other courts. Section 362(a) provides that the filing of a bankruptcy petition automatically operates as a stay of judicial actions, except for actions enumerated in § 362(b). 11 U.S.C. § 362(a). Section 362(b) excepts several types of judicial actions from imposition of the automatic stay, *id.* § 362(b), and § 362(d) provides a mechanism for "part[ies] in interest" to challenge the imposition of the stay in several circumstances, including "for cause," *id.* § 362(d)(1). The Bankruptcy Code therefore accounts for the fact it may not always be appropriate to permit debtors to take advantage of the automatic stay.[29] Thus, to

---

[29]Section 362(d)(1) provides:

    (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —

the extent that debtors like the Shermans use bankruptcy to seek refuge from another court, § 362(b) and (d) describe the circumstances in which such conduct is impermissible, which parties may challenge such conduct, and the appropriate remedy.

There is nothing problematic about an individual filing a legitimate bankruptcy petition with the intention of taking advantage of the automatic stay provisions. Indeed, the legislative history of the Bankruptcy Code makes clear that one of the purposes of the automatic stay is to give a debtor a "breathing spell from his creditors" during which the debtor can "attempt a repayment . . . plan, or simply . . . be relieved of the financial pressures that drove him into bankruptcy." H.R. Rep. No. 95-595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97 (observing that another purpose of the automatic stay is to protect creditors by providing "an orderly liquidation procedure under which all creditors are treated equally" rather than "a race of diligence by creditors for the debtor's assets"); *see also Stringer v. Huet* (*In re Stringer*), 847 F.2d 549, 551-52 (9th Cir. 1988) (citing this legislative history and noting the purposes of the automatic stay). While it is troubling to allow an individual filing an *illegitimate* bankruptcy petition, such as one based on misrepresentations, to take advantage of automatic stay provisions, the viability of such a bankruptcy petition is addressed under the provisions of the Bankruptcy Code that protect against illegitimate filings of petitions (such as § 727) and under the "cause" provision of § 362(d)(1).

The remedy in the "cause" provision of § 362(d)(1) is a considerably more direct way to deal with a debtor who is

----

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

11 U.S.C. § 362(d)(1).

improperly using bankruptcy as a refuge from the jurisdiction of another court than the remedy in the "cause" provision of § 707(a). Preventing a debtor from taking advantage of the stay is a remedy tailored to the problem of improper avoidance of jurisdiction of another court. In contrast, § 707(a)'s remedy — the dismissal of the bankruptcy petition altogether — is too powerful a medicine for the problem at hand, as it precludes adjudication of the bankruptcy even where there are debts aside from pending litigation that exceed assets.

It is worth noting that in this case, any attempt to avoid entirely the jurisdiction of the district court in the disgorgement action did not work, precisely because of the operation of § 362. The district court found the exception contained in § 362(b)(4) applicable and *did* adjudicate the disgorgement motion to judgment. To now include an unsuccessful attempt to avoid jurisdiction as an aspect of "cause" to dismiss the bankruptcy petition altogether is to tinker with a complex statutory scheme that specifies when — and how — to deal with various kinds of debtor misconduct and, as the fate of the automatic stay argument in this case indicates, is fully capable of doing so. In contrast, were we to hold that the Shermans' use of bankruptcy to avoid the jurisdiction of another court is "cause" to dismiss the bankruptcy, we would be sanctioning a readjustment of the finely wrought statutory scheme. *See Knupfer v. Lindblade* (*In re Dyer*), 322 F.3d 1178, 1190 (9th Cir. 2003) (describing *Walls v. Wells Fargo Bank*, 276 F.3d 502 (9th Cir. 2002), as "[n]oting that 'it is not up to us to read other remedies into the carefully articulated set of rights and remedies set out in the Bankruptcy Code' " and "reject[ing] Walls' invitation to read § 105(a) as a catch-all private right of action for the enforcement of other Bankruptcy Code provisions" (quoting *Walls*, 276 F.3d at 507)).

**[18]** Second, § 547(b) addresses misconduct related to using bankruptcy as what the SEC terms a "scorched earth" tactic.[30] Section 547(b) makes certain prepetition transfers of

---

[30]In addition, § 727(a)(2) addresses some debtor conduct that might be characterized as engaging in "scorched earth" tactics. Under § 727(a)(2),

a debtor's interest in property "avoid[able]" as a preference. 11 U.S.C. § 547(b). To be avoidable, such transfers must meet several requirements, including that they were made "to or for the benefit of a creditor," and "on or within 90 days before the date of the filing of the petition" or "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider."[31] *Id.* § 547(b)(1), (4). The Bankruptcy Code thus "contemplates" the notion that a debtor may favor some creditors over others by making prepetition transfers, and describes the circum-

a bankruptcy court is to grant the debtor a discharge unless, inter alia, the debtor transferred property "within one year before the date of the filing of the petition," "with intent to hinder, delay, or defraud a creditor." 11 U.S.C. § 727(a)(2).

[31]Section 547(b) provided in full:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property —

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made —

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if —

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

stances in which such conduct is impermissible, which parties may challenge such conduct, and the appropriate remedy for the misconduct.

Ordinarily, an avoidance action under § 547 can be filed only by a trustee, not a creditor. *See id.* § 547(b) ("*[T]he trustee* may avoid any transfer of an interest of the debtor in property . . . . " (emphasis added)); *Avalanche Mar., Ltd. v. Parekh* (*In re Parmetex, Inc.*), 199 F.3d 1029, 1031 (9th Cir. 1999) (holding that although "a trustee must generally file an avoidance action under Chapter 7," creditors may bring such an action "where the trustee stipulated that the Creditors could sue on his behalf and the bankruptcy court approved that stipulation"). That a creditor cannot usually file an avoidance action is not, however, inconsistent with the conclusion that the Bankruptcy Code "contemplates" the "misconduct" of debtors who use "scorched earth" tactics. To the contrary, that restriction provides support for the notion that courts should not allow *other* parties to seek similar relief under § 707(a), as doing so would undermine Congress's considered judgment regarding who may seek such relief. Like the remedy under § 362, the remedy under § 547 is tailored to deal with a particular tactic, including, as in this instance, a debtor attempting to use bankruptcy to hurt a particular, disfavored creditor. If, therefore, the Shermans impermissibly engaged in a so-called "scorched earth" tactic, then the appropriate vehicle for dealing with such misconduct is § 547(b).

**[19]** Third, § 727(a)(4)(A) addresses misconduct related to debtors' misrepresentations of liabilities and expenses. Section 727(a)(4)(A) states that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case [ ] made a false oath or account." 11 U.S.C. § 727(a)(4)(A). This mechanism for dealing with debtors who make misrepresentations describes the circumstances in which such conduct is impermissible, which parties may challenge such conduct, and the appropriate remedy for the misconduct. In particular, the Bankruptcy Code

imposes a mens rea element, indicating that Congress intended to sanction only culpable misrepresentations. To the extent, then, that the allegations of misstating liabilities and expenses are true, the proper remedy is in the bankruptcy court under § 727(a)(4)(A).

Notably, the SEC does not argue that there was any debt-specific misconduct, which would, alone or in conjunction with other misconduct, constitute "cause" under § 707(a) for dismissal of the petition. Had the SEC made such an argument, we would need to decide whether § 523 of the Bankruptcy Code, the section that makes specific debts nondischargeable, "contemplated" such misconduct.[32] *See, e.g., id.* § 523(a)(2),[33] (4),[34] (6),[35] (7);[36] *see also id.*

---

[32] In its brief to the district court in the appeal of the denial of the motion to dismiss, the SEC stated that it believed that relief would have been available under § 523 for the contempt judgment but not for the disgorgement judgment.

[33] In relevant part, § 523(a)(2) excepts from discharge debt:

(2) for money . . . obtained by —

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing —

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2)(A)-(B). It appears that in many cases in which the SEC is attempting to ensure that a debtor in bankruptcy disgorges funds as required by the securities laws, it does so by invoking § 523(a)(2). *See Cross*, 218 B.R. at 78; *Hodge*, 216 B.R. at 933; *Kane*, 212 B.R. at 699.

§ 523(a)(19) (Supp. II 2002).**[37]**

---

Unlike the cited cases, the present case involves a debtor who was not found to have himself violated the securities laws and has not been alleged to have committed other acts of fraud by the SEC. The SEC has indicated that this distinction is the reason it did not file a nondischarge action. Whether that distinction matters or whether, instead, § 523(a)(2) nonetheless applies to the present circumstances because the funds themselves meet the statutory standard and Sherman was essentially a depository of the funds, having no rightful claim to them, is a question we do not decide. *See Colello*, 139 F.3d at 676-77.

**[34]**Section 523(a)(4) excepts from discharge debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

**[35]**Section 523(a)(6) excepts from discharge debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

**[36]**Section 523(a)(7) excepts from discharge debt:

> (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty —

>> (A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

>> (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition . . . .

11 U.S.C. § 523(a)(7).

**[37]**Section 523(a)(19) excepted from discharge debt:

> (19) that —

> (A) is for —

>> (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

>> (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

**[20]** Thus, under the first part of the *Padilla* inquiry, because other Code provisions contemplate (1) taking refuge from the jurisdiction of another court; (2) engaging in a "scorched earth" tactic against a particular creditor; and (3) making misrepresentations in bankruptcy filings, we conclude that there is no "cause" to dismiss the Shermans' bankruptcy petition because of any such behavior. To respect the complex statutory scheme that Congress has created to deal with malfeasance associated with bankruptcy petitions, we are loath to hold that a factor constitutes "cause" unless the Bankruptcy Code regime is incapable of righting wrongs of the kind alleged.

---

(B) results from —

    (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

    (ii) any settlement agreement entered into by the debtor; or

    (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19) (Supp. II 2002). Section 523(a)(19) was added to § 523 by the Sarbanes-Oxley Act, passed on July 30, 2002. *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 803(3), 116 Stat. 745; *see also Smith v. Gibbons* (*In re Gibbons*), 289 B.R. 588, 591-97 (Bankr. S.D.N.Y. 2003) (holding that § 523(a)(19) applies to all bankruptcies pending at the time it was enacted), *aff'd*, 311 B.R. 402 (S.D.N.Y. 2004), *aff'd*, No. 04-4617-BK, 2005 WL 3134156 (2d Cir. Nov. 21, 2005) (unpublished). Section 523(a)(19) was amended slightly by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1404(a), 119 Stat. 23.

  The SEC has not argued that § 523(a)(19) applies to the contempt or disgorgement judgments, and we therefore express no opinion on this matter. We note, however, that if it does apply, the SEC is not time-barred from taking advantage of its protections. *See infra* note 37.

Our holding hardly leaves the SEC unprotected, as the SEC could have pursued — and did pursue — several vehicles for protecting itself. In particular, the SEC *was* protected against the use of bankruptcy to avoid the jurisdiction of another court because, under § 362(b)(4), it was not subject to the automatic stay. Further, the SEC could have sought to avoid some of the Shermans' prepetition transfers as preferences had it been concerned that the Shermans had engaged in a "scorched earth" tactic. In addition, the SEC could have tried to protect itself against misrepresentations in the bankruptcy petition by filing a complaint under § 727(a)(4)(A).[38] Moreover, the SEC may have been able — and may still be able — to avoid discharge of the contempt and disgorgement judgments under § 523.[39] Finally, had the SEC been concerned

---

[38]The SEC was eligible as a creditor to file a complaint under § 727. *See* 11 U.S.C. § 727(c)(1) (stating that "a creditor . . . may object to the granting of a discharge under subsection (a) of this section").

As for timing requirements, as noted earlier, a "complaint objecting to the debtor's discharge under § 727(a) of the Code shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)." FED. R. BANKR. P. 4004(a). It appears that the first date set for the meeting of creditors was March 25, 2002. The time fixed for filing a complaint therefore expired on May 24, 2002. If the SEC had wanted to file a complaint objecting to the Shermans' discharge under § 727(a)(4)(A), then it would have needed to do so by May 24, 2002.

[39]The SEC was, and is, eligible as a creditor to file complaints under § 523. FED. R. BANKR. P. 4007(a) ("[A]ny creditor may file a complaint to obtain a determination of the dischargeability [under § 523] of any debt.").

Timing requirements for filing § 523 nondischargeability complaints differ depending on which subsection of § 523(a) is invoked. "A complaint to determine the dischargeability of a debt under § 523(c) [then covering § 523(a)(2), (4), (6), and (15)] shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)." FED. R. BANKR. P. § 4007(c). Hence, had the SEC wanted to file a complaint under § 523(a)(2), (4) or (6), then it appears that it would have needed to have done so by May 24, 2002.

In contrast, "[a] complaint other than under § 523(c) may be filed at any time. A case may be reopened without payment of an additional filing fee for the purpose of filing a complaint to obtain a determination under this rule." FED. R. BANKR. P. § 4007(b). It thus appears the SEC could have filed — and still could file — a complaint under § 523(a)(7) or (19).

about an abuse of process, it could have sought a remedy under the bankruptcy court's inherent authority to sanction debtors who file bankruptcy petitions in bad faith. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Dyer*, 322 F.3d at 1190 n.14, 1196; *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 279, 284 (9th Cir. 1996).

**[21]** In sum, the SEC's and the district court's frustration with Sherman's behavior both before and after the filing of the bankruptcy petition is understandable. *Padilla* does not, however, permit a free-floating concept of cause for dismissal to substitute for careful application of the bankruptcy scheme Congress devised, including the multitude of remedies for abusive behavior or behavior harmful to the public interest. The district court's decision is reversed, and the case is remanded for further proceedings consistent with this opinion.

**REVERSED.**

---

Alternatively, the SEC may have been able — and may still be able — to take advantage of the protections afforded by § 523(a)(7) and (19) by attempting to collect the debt in a nonbankruptcy court, where the applicability of § 523(a)(7) and (19) could have been litigated. *See Rein v. Providian Fin. Corp.*, 270 F.3d 895, 904 n.15 (9th Cir. 2001).